Filed:  April 18, 2002

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

_____

No. 01-6703

_____

James Harvey,

Plaintiff - Appellee,

versus

Robert F. Horan, Jr., etc.,

Defendant - Appellant.

_____

O R D E R

_____

The court amends its published rehearing order, filed March 28, 2002, as follows:

On page 38, first paragraph, line 9 -- the phrase "the following three pages" is corrected to read "the following two pages."

On page 40, first full paragraph, first line after indented quotation -- the phrase "(emphasis added)" is added after the citation to Harvey.

On page 44, first full paragraph, line 3 -- the phrase "the state's intervening order" is corrected to read "the state court's intervening order."

For the Court - By Direction


/s/ Patricia S. Connor
Clerk

PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

JAMES HARVEY,
        *Plaintiff-Appellee,*

        v.

ROBERT F. HORAN, JR.,
Commonwealth's Attorney, County                        No. 01-6703
of Fairfax,
        *Defendant-Appellant.*

JENNIFER THOMPSON; KAREN R.
POMER; JERI ELSTER,
        *Amici Curiae.*

Filed: March 28, 2002

_____

ORDER

Appellee filed a petition for rehearing and rehearing en banc.

Judge King voted to grant panel rehearing. Chief Judge Wilkinson and Judge Niemeyer voted to deny.

No member of the Court requested a poll on the petition for rehearing en banc.

Chief Judge Wilkinson filed an opinion concurring in the denial of rehearing and rehearing en banc. Judge Luttig filed an opinion respecting the denial of rehearing en banc.

The Court denied the petition for rehearing and rehearing en banc. Entered at the direction of Chief Judge Wilkinson for the Court.

WILKINSON, Chief Judge, concurring in the denial of rehearing and rehearing en banc:

There is no doubt that Harvey should receive the biological evidence in this case for DNA testing using technology that was unavailable at the time his Virginia conviction became final. In fact, the panel opinion suggested that the state courts could order DNA testing. *See Harvey v. Horan*, 278 F.3d 370, 380 (4th Cir. 2002) (stating that "state courts are free in ways that we are not to set the ground rules by which further collateral attacks on state convictions such as Harvey's may be entertained"). And that is precisely what the state courts have now done. The question before us is thus not whether Harvey should or will receive the DNA evidence. He should and he will. Rather, the issue is whether a § 1983 action brought in federal court in the first instance is the appropriate vehicle for him to access that evidence.

I nonetheless confess myself puzzled over the discussion herein. The issues have been extensively addressed in the earlier majority and concurring opinions. No member of the court requested a poll on the suggestion for rehearing *en banc*, and my brother agrees "that a denial of rehearing *en banc* is now the proper disposition of this particular case." *Post* at 44. However, inasmuch as my colleague has undertaken an extended discussion of his own, I tender this brief response.

I.

A.

The threshold question posed by Harvey's § 1983 action relates to the nature of the constitutional right he asserts. There are two possibilities here, one procedural and the other substantive. The procedural right is the right to press and proclaim one's innocence in a federal forum in the first instance when seeking access to DNA testing, even where the judgment to be challenged is a state conviction.

The American criminal justice system rightly sets the ascertainment of truth and the protection of innocence as its highest goals. The average school child is aware (or so we hope) that the accused is

2

clothed with a presumption of innocence and that the prosecutor must prove beyond a reasonable doubt that a crime was committed. Moreover, the concern with innocence does not end at trial. Elaborate post-conviction procedures are rightly in place to ensure not only that a trial was fair, but also that no individual has been wrongly convicted.

Our system however does not allow any person to press a claim of innocence at any time, at any place, and in any manner. The assertion of innocence, just as the assertion of any right, is intertwined with orderly process. It matters, for example, that a Virginia prisoner has sought here to bypass Virginia's system of criminal justice altogether, and proceed directly into federal court under § 1983. Such disregard of process is an anomaly in an area where criminal defendants, above all, rely on proper process to protect their rights. What Alexander Bickel termed "the morality of process" in the political system has application to criminal justice as well. Alexander M. Bickel, *The Morality of Consent* 123 (1975). Shorn of process, neither the innocent nor the public upon whom offenders prey will have any assurance of justice.

The panel opinion identifies the multiple procedural problems Harvey's § 1983 claim faces. *See Harvey*, 278 F.3d at 374-80. Yet the separate opinion would throw each and every one of these considerations to the winds. As Harvey's case shows, state courts, if given a chance, can rise to their responsibilities. Yet my good colleague would not only deny them that chance, but do so in unprecedented fashion, encouraging state prisoners to press their claims initially in federal court while disregarding all state court procedures and all state legislative avenues of redress.

This is not to say that the federal courts are uncharitable with respect to claims of innocence. For example, Rule 33 of the Federal Rules of Criminal Procedure authorizes motions for a new trial on the basis of newly discovered evidence. And the seminal case of *Jackson v. Virginia*, 443 U.S. 307 (1979), allows a state prisoner to press a claim of innocence in federal court on the ground that "the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt." 443 U.S. at 321. *See also Herrera v. Collins*, 506 U.S. 390, 404 (1993) (stating that "`actual innocence' is not itself a consti-

3

tutional claim," but that it can serve as a "gateway" through which a habeas petitioner can "have his otherwise barred constitutional claim considered on the merits").

It is important however that claims of innocence should be entertained, where possible, in the first instance by the court, or at least by the court system, that initially heard the case. Such a rule, ostensibly directed to considerations of venue or comity, actually serves a larger purpose. It recognizes in the underlying conviction not a conclusion of infallibility, but a presumption of legitimacy. That presumption would be lost if the court rendering the conviction could simply be disregarded and bypassed at will, which is what Harvey sought to do in fashioning his claim of innocence as a § 1983 suit. By design, judgments of conviction in criminal cases are not casually reached. The efforts of jurors, judges, witnesses, prosecutors, and defense attorneys represent a considerable and conscientious effort at achieving justice — an effort which would be lost if the court or system rendering the judgment were entitled to no respect or even so much as acknowledgment thereafter.

## B.

In addition to the procedural difficulties Harvey's claim presents, this case poses the intractable problem of identifying the precise nature and scope of the substantive due process right that a federal court would have to bestow on Harvey in order for his § 1983 claim to proceed. Both the panel majority opinion and the concurrence recognized this. *Harvey*, 278 F.3d at 375-77, 380, 387-88 & n.7. Indeed, the separate opinion acknowledges as well just how "formidable" the task of identifying the precise parameters of such a right would be. *Post* at 36. It accordingly declines to specify even the rough contours of the constitutional right of post-conviction access to DNA evidence that it divines. *Post* at 36. The separate opinion merely states, without explanation, that such a right would be "narrowly confine[d]" and governed by "strict and limiting" standards. *Id.* In the end, we are left to guess whether even Harvey himself would qualify for additional DNA testing under the separate opinion's newly minted constitutional right of access to evidence. *Post* at 43.

We are kept in the dark about what such a right would actually look like not just because defining the scope of the right would be

4

"imprudent." *Post* at 36. It is no more imprudent to define a right one has declared to exist than it is to assert its existence to begin with. It is not imprudence that accounts for this silence, but rather the humbling reality that it may well be impossible for a judge-qua-judge to accomplish this feat. That is why this task is one appropriately left to legislatures.

A myriad of questions would have to be answered in order to define the parameters of a constitutional right to post-conviction access to DNA evidence. For instance, we would have to decide who could claim a right to DNA testing — in particular, whether such a right would apply to all prisoners or only those who committed certain crimes or who were serving some minimum prison term. Further, we would have to determine what threshold showing was required in order for a prisoner to receive post-conviction DNA testing. For example, does identity have to have been an issue at trial? What if the prisoner has pleaded guilty? In addition, we would have to decide to whom a request for post-conviction testing would be made and on the standard that the decision-maker would use in determining whether testing was appropriate. For example, must a prisoner show only that the untested evidence might possibly assist his claim of innocence, or that a reasonable probability exists that the outcome of his trial would have been different if the test results had been available? Or does some stricter standard apply? Moreover, we would have to determine whether there was a statute of limitations for bringing the request in the first place.

Next, we would have to work out details of the testing system itself. First, we would have to identify who would bear the costs of the DNA testing. Would it be the state or federal government, the prisoner, or only prisoners who can afford the testing? Would we wait to determine if DNA testing had proved wholly or arguably successful for the requesting prisoner before determining who bears the cost? And we would have to decide if a state laboratory would conduct the test or if a prisoner or judge could select a private lab. We would also have to specify whether counsel would be appointed for every indigent person seeking testing. In addition, we would have to determine how long DNA evidence would have to be preserved and decide whether preservation was automatic or conditioned upon motion from a prisoner. Further, we would have to establish who would evaluate

5

the DNA test results and when a result was conclusive enough of innocence to warrant further relief. Finally, we would have to lay out the relief that could be granted. Is a new trial or a pardon more appropriate? And upon a favorable test result, could a prisoner bring a claim for monetary relief for a wrongful conviction?

Harvey would have the federal courts disregard the fact that both the Congress of the United States and the various state legislatures are presently wrestling with exactly these sorts of questions. Only the most aggressive view of federal judicial power could lead us to preempt both a coordinate branch of the federal government and the state courts and legislatures with what would in essence be prescriptive law making of our own.

Thus my brother asks that we take a big step. If we were to vindicate Harvey's claim, it would have to be because, as the separate opinion appears to conclude, *post* at 32-33, there was some substantive due process right to the fruits of scientific discoveries made after a conviction had become final — here, the advances in DNA testing technology.

It is certainly true and a cause for celebration that DNA testing holds much promise. And there is no question that accused individuals and convicted inmates, as well as prosecutors, should reap the benefits of it. Indeed, many scientific advances promise substantial advantages. But this does not mean that we are free to constitutionalize a right of access to the fruits of scientific discoveries. There are often trade-offs to be faced when science advances. Scientific progress frequently presents questions of resource allocation, interpretation, application, privacy, and ethics. Balances must be struck between societal risks and benefits, between alternative ways of understanding and employing new techniques, and between permissible and impermissible uses.

The courts should not precipitously offer answers to these questions. The issue raised in Harvey's case is one we will confront many times again: Should the courts through the conversation-stopping process of constitutionalization decide for society what uses will be made of scientific progress, or should we await the input of legislative bodies before weighing in ourselves? The case for legislative bodies

6

retaining control of advances in science is powerful because scientific discoveries have the potential to affect society in ways that may be profoundly beneficial or profoundly harmful. As science marches forward in our courts, it is not remiss to respect the ability of the political process to address its many implications.

## II.

I repeat my hope that inmates such as Harvey will receive DNA testing. And I repeat my faith that the American system will provide it to them. This is not an area in which legislative bodies have gone into permanent recess. On the contrary, the panel majority opinion detailed the fact that Congress is actively considering legislative initiatives in this area. *See Harvey*, 278 F.3d at 376-77, 380. The Innocence Protection Act, which has been introduced in both houses of Congress, would increase the availability of post-conviction DNA testing for an individual convicted of a federal crime. Further, the Act would condition the grant of federal funds for state DNA-related programs on an assurance that the state would make post-conviction DNA testing available in certain types of cases. *See* S. 486 §§ 101-104, 107th Cong. (2001), 147 Cong. Rec. S1999, 2001-03 (Mar. 7, 2001); H.R. 912 §§ 101-104, 107th Cong. (2001).

Virginia has also passed legislation increasing the availability of post-conviction DNA testing, which Harvey himself successfully invoked in state court following oral argument in this case. *See Harvey*, 278 F.3d at 377, 380 n.3. Virginia Code § 19.2-327.1 allows a convicted felon to apply to the state circuit court for DNA testing if, *inter alia*, the biological evidence was not subjected to the current DNA testing method and the testing is "materially relevant, noncumulative, and necessary and may prove the convicted person's actual innocence." Va. Code Ann. § 19.2-327.1 (Michie Supp. 2001). In addition, the Virginia statute details what a petitioner must set forth in his motion for post-conviction DNA testing, sets a timetable for the circuit court to hold a hearing on a prisoner's motion, and structures the circuit court's decision-making process on the petition. *Id.*

The federal government and the Commonwealth of Virginia are far from alone in this area. In 1994, New York was the first state to pass a statute addressing post-conviction DNA testing. *Developments in*

7

*the Law: Confronting the New Challenges of Scientific Evidence*, 108 Harv. L. Rev. 1481, 1573 (1995). And legislatures across the country are currently considering and enacting initiatives. In 2001 alone, seventeen states passed laws "to provide convicted criminals with improved access to DNA testing." *Always an eye for an eye?*, The Economist, Jan. 5, 2002, at 26-27. State legislatures have set detailed ground rules for these types of actions, answering the numerous questions discussed above that post-conviction DNA testing raises. The legislatures have spelled out not only the circumstances in which a motion for additional DNA testing can be made, but also where such motions must be brought. They also have identified the parameters that control whether additional testing will be made available, whether a decision to grant or deny testing is appealable, who must bear the cost of the testing, and what relief is available if the results are favorable to the petitioner. *See, e.g.*, N.Y. Crim. Proc. Law § 440.30 (McKinney Supp. 2001); Fla. Stat. Ann. §§ 925.11, 943.3251 (West Supp. 2001); Cal. Penal Code § 1405 (West Supp. 2002).

The statutes reveal that there are many different approaches to resolving these issues. Within the Fourth Circuit alone, there is substantial variation in the approaches taken by Virginia, Maryland, and North Carolina, which have already enacted post-conviction DNA testing provisions. For example, the Virginia statute applies to people convicted of a felony, does not specify who pays for the DNA testing, and states that the testing will be performed by the Virginia Division of Forensic Science. *See* Va. Code Ann. § 19.2-327.1. In contrast, the Maryland statute applies only to people convicted of certain crimes, specifies that the petitioner shall pay the costs of the testing unless the results are favorable (in which case the state pays), and allows the judge reviewing the petition to select a laboratory for the testing from a list of accredited labs. *See* Md. Code Ann., Crim. Proc. § 8-201 (Michie 2001). In further contrast, the North Carolina statute applies to any criminal defendant, requires the defendant to pay the cost of the DNA testing unless he is indigent (in which case the state bears the cost), and does not indicate which lab will conduct the testing. *See* N.C. Gen. Stat. § 15A-269.

To constitutionalize this area, as the separate opinion would, in the face of all this legislative activity and variation is to evince nothing

8

less than a loss of faith in democracy. It is to believe that democratic processes are incapable of rising to the challenge, and that federal courts must do the governing for us. In the end, this will deaden the lifeforce of democracy. It will cause legislatures across our nation to simply surrender the impulse to innovate based on the assumption that the federal courts are prepared to step in at any time. It will encourage elected officials to sit on their hands and turn over their responsibilities to federal judges. To be sure, the displacement of elected officials by judicial authority always pleases some of the people some of the time. But with activism, what goes around comes around. Today's merriment becomes tomorrow's mourning.

## III.

To constitutionalize a right to post-conviction DNA testing in federal court in the first instance would have unfortunate consequences for our federalism as well. To recognize a § 1983 claim here, we would effectively have to overrule this court's decision in *Hamlin v. Warren*, 664 F.2d 29 (4th Cir. 1981), and the Supreme Court's decision in *Preiser v. Rodriguez*, 411 U.S. 475 (1973). The lesson of *Hamlin* and *Preiser* is that the state courts should have the first chance to review challenges to a state judgment of conviction. But Harvey never presented his claim in the Virginia courts until after the panel had heard oral argument in this case.

This court in *Hamlin* recognized the reality of such a situation when we held that a prisoner's § 1983 claim had to proceed under the habeas framework when the prisoner was seeking to establish "every predicate" for a subsequent request for release. 664 F.2d at 30, 32. We concluded that when a complaint "has all the earmarks of a deliberate attempt to subvert the [exhaustion] requirement of [28 U.S.C.] § 2254(b)," a petitioner must observe the habeas requirements, "notwithstanding the absence of any request for release." *Id.* at 32.

This fundamental doctrine ensures that states will be given at least the initial chance to review their own judgments before a federal court jumps into the fray. As the Supreme Court emphasized in *Preiser*, the exhaustion requirement "is rooted in considerations of federal-state comity," and it would "wholly frustrate explicit congressional intent" to allow state prisoners to evade the exhaustion requirement "by the

9

simple expedient" of putting a § 1983 label on their pleadings. 411 U.S. at 489-92 & n.10.

The separate opinion contends that *Heck v. Humphrey*, 512 U.S. 477 (1994), "was actually a quite narrow decision," and that *Heck* would allow Harvey's claim to proceed under § 1983. *Post* at 17. However, the whole point of *Heck* was to keep a state prisoner from challenging his conviction in federal court in the first instance through an unexhausted habeas claim masquerading as a § 1983 claim. Indeed, the requirement that a state prisoner exhaust state remedies before challenging his conviction in federal court has such a basic place in Supreme Court jurisprudence that it hardly needs mentioning. *See, e.g.*, *Rose v. Lundy*, 455 U.S. 509, 515 (1982) (explaining that "[t]he exhaustion doctrine existed long before its codification by Congress in 1948"). It is inconceivable that *Heck* meant to displace this long line of Supreme Court precedent on the exhaustion requirement, or that it stands for the proposition that claims such as Harvey's may proceed *ab initio* in federal court.

IV.

Harvey achieved the relief he sought through the state courts and the state legislatures. And our decision in his case respects the proper role of the federal courts within the federal system. The separate opinion does just the opposite. With little hesitation, my colleague disregards the roles of all the other actors in the American system. His approach overturns longstanding Supreme Court precedent, to which lower court judges and even the Justices themselves owe deference. His view makes the Congress of the United States a subordinate player on the very difficult questions involved in determining the entitlements of individuals to the fruits of scientific advances. His approach treats both state legislatures and state court systems as junior partners with respect to their own trials and judgments.

With all respect, there is a better way.

LUTTIG, Circuit Judge, respecting the denial of rehearing *en banc*:

I concur in the court's judgment to deny rehearing of this case *en banc*, but I do so only because it appears that appellee Harvey will,

10

pursuant to state court order entered after our panel's decision, be afforded the chance to subject the forensic evidence in question to further DNA tests — the same relief that he seeks from this court. In light of this order, we likely do not have the authority to rehear this case even before the panel, much less before the court *en banc*. However, were it not for this intervening state court action, in my view this case would have been appropriate for full court review. For I believe that both the threshold procedural question of whether appellee asserts a cause of action under 42 U.S.C. § 1983 and the fundamental constitutional question of whether there exists under the Constitution of the United States a right, post-conviction, to access previously-produced forensic evidence for the purposes of further DNA testing are important questions of law. And I believe that each question was decided incorrectly by the panel whose decisions have been drawn into question by appellee's petition for rehearing *en banc*.

So believing, and having no other opportunity to express my views on these important questions — the panel opinion now constituting the law of our Circuit — I set forth those views herein.

I.

Because of scientific advances in the testing of deoxyribonucleic acid, particularly Short Tandem Repeat (STR) DNA testing, one of the most important criminal law issues of our day is whether there exists under the Constitution of the United States a right, post-conviction, to access previously-produced forensic evidence for purposes of such, and related, DNA testing in order to establish — before the executive, if not also before the courts — one's complete innocence of the crime for which he has been convicted and sentenced. This issue is of especial importance where the right is asserted by one who, for capital offense, has been sentenced to death, but the principle at stake is no different for one who has been sentenced not to death, but to a term of extended incarceration.

STR DNA and related techniques represent historic scientific developments, increasing exponentially the reliability of forensic identification over earlier techniques. There is now widespread agreement within the scientific community that this technology, which requires literally cellular-size samples only, can distinguish between

11

any two individuals on the planet, other than identical twins, the statistical probabilities of STR DNA matches ranging in the hundreds of billions, if not trillions. In other words, STR DNA tests can, in certain circumstances, establish to a virtual certainty whether a given individual did or did not commit a particular crime.[1]

_____

[1] While it is both unnecessary and impossible to canvass the now vast literature on the new forensic DNA technology, this technology is qualitatively different from all that proceeded it. Current techniques can often yield reliable results from even a single cell, *see* I. Findlay et al., DNA Fingerprinting from Single Cells, 389 *Nature* 555 (1997). Thus, for example, one single sperm cell recovered in a sexual assault case could exonerate (or inculpate) the defendant. And generally, a mere 50-100 cells suffice. *See* National Institute for Justice, *Postconviction DNA Testing: Recommendations for Handling Requests* xv (1999). Identifications have been made based on cells left on briefcase handles, car keys, and telephone handsets used by suspects. *See* Roland van Oorschot & Maxwell Jones, DNA Fingerprints from Fingerprints, 387 *Nature* 767 (1997). Moreover, STR testing is capable of producing information even when samples are severely degraded. *See* Lucia Sacchetti et al., Efficiency of Two Different Nine-Loci Short Tandem Repeat Systems for DNA Typing Purposes, 45 *Clinical Chemistry* 178, 181 (1999).

The current standard STR test examines 13 independent regions of DNA ("loci"), *see* National Institute for Justice, *Improved Analysis of DNA Short Tandem Repeats* 2 (2001), although testing at just 8-10 loci usually is sufficient to distinguish between any two persons who are not identical twins. *See* Devlin et al., Statistical Evaluation of DNA Fingerprinting: A Critique of the NRC's Report, 259 *Science* 748 (1993). In fact, researchers have found that the probability that any two unrelated individuals match at 9 specific loci (the "matching probability") is approximately 1 in 740 billion. *See* Lucia Sacchetti et al., Efficiency of Two Different Nine-Loci Short Tandem Repeat Systems for DNA Typing Purposes, 45 *Clinical Chemistry* 178, 182 (1999); *see also* Stephen J. Cina et al., 21 *Am. J. Forensic Medical Pathology* 97 (2000) (reporting matching probability of 1 in 643 billion in 8 loci system among white women). Because the standard test probes 13 loci (not 8 or 9), it should be correspondingly more powerful. Even the most conservative estimates have placed this matching probability as high as 1 in 100 billion, *see Improved Analysis* at 15. It is also worth noting that some current generation STR systems have matching probabilities on the order of 1 in 1 quadrillion. *See* Mark Benecke, DNA Typing in Forensic Medicine and in Criminal Investigations: A Current Survey, 84 *Naturwissenschaften* 181,

These scientific advances, which have rendered it literally possible to confirm guilt or innocence beyond any question whatsoever, at least in some categories of cases, are no ordinary developments, even for science. And neither can they be treated as ordinary developments for law, as fully understandable is the temptation to do so because of the exceedingly difficult issues that otherwise are brought forth. Instead, permitting as they do the generation of evidence qualitatively like no other previously known, these scientific advances must be recognized for the singularly significant developments that they are — in the class of cases for which they actually can prove factual innocence, the evidentiary equivalent of "watershed" rules of constitutional law. *See Teague* v. *Lane*, 489 U.S. 288 (1989). And the questions these significant developments beget must in turn be recognized for the serious constitutional questions that they are.

I believe that judicial recognition of this new science, and of the profound questions that it occasions, should, given law's foundational concern for the determination of guilt and innocence, be unbegrudging. It is fully warranted, in the first instance, for all to be concerned over the burdens to our system of justice that will attend recognition of a constitutional right of access to DNA evidence post-conviction. If such a right is determined to exist, it is thereafter equally warranted to be concerned over the standards governing first, entitlement to such access, and second, the use in the courts, if any, of the results obtained from DNA tests.

But no one, regardless of his political, philosophical, or jurisprudential disposition, should otherwise be troubled that a person who was convicted in accordance with law might thereafter be set free,

_____

183 (1997). For purposes of understanding the magnitude of these figures of probability, it is estimated that there are only 6 billion persons on the planet. *See* http://www.un.org/esa/population/demobase.

Thus does it follow that, in certain cases, STR DNA evidence is capable of exonerating defendants (or those wrongly convicted) to a practical certainty. *See generally* David J. Balding & Peter Donnelly, Inferring Identity from DNA Profile Evidence, 92 *Proc. Nat'l Acad. Sci.* 11741 (1995) (developing a framework for statistical analysis of DNA evidence that includes non-DNA factors).

13

either by the executive or by the courts, because of evidence that provides absolute proof that he did not in fact commit the crime for which he was convicted. Such is not an indictment of our system of justice which, while insisting upon a very high degree of proof for conviction, does not, after all, require proof beyond *all* doubt, and therefore *is* capable of producing erroneous determinations of both guilt and innocence. To the contrary, it would be a high credit to our system of justice that it recognizes the need for, and imperative of, a safety valve in those rare instances where objective proof that the convicted actually did not commit the offense later becomes available through the progress of science. Indeed, if it is agreed that, in a given class of cases, it would be possible to establish to a certainty through such further analysis that one did not in fact commit the crime for which he was convicted and sentenced, then grave harm would come to the Constitution were it to be dismissively interpreted as foreclosing access to such evidence under any and all circumstances and for any and all purposes (judicial or even executive). The Constitution is not so static.

As I allude to, this is not at all to say that post-conviction access to evidence for further testing in light of scientific advance is (or ought to be) constitutionally required or permitted as a matter of course or even frequently. It should not be, not only because of the presumption of correctness rightly enjoyed by final judgments of conviction and the separate, indisputable interest in the finality of such judgments, but also because of the reality that only rarely will further testing hold out the possibility that the convicted actually can be proven innocent of the crime. Rather, it is only to say that it is unwise to hold categorically that there is not, under our Constitution, and never can be, a post-conviction right of access to evidence for the purpose of conducting tests, which, it is agreed, can definitively establish innocence. Such a categorical holding is no less to be avoided than a categorical holding that actual innocence is not, and can never be, a freestanding constitutional right. To hold either is simply to confer a sanctity upon finality that not even that concededly substantial interest deserves.

II.

The questions of whether there is or is not a constitutional post-conviction right to access evidence for purposes of DNA testing, and

14

if there is such a right, the circumstances under which that right may be asserted, are not ones that courts should particularly relish decision upon, so difficult and delicate, I believe, are the answers to these questions. However, these questions cannot long be avoided, now that the science is available. And, indeed, depending upon how one answers the threshold question of whether the assertion of such a right of access is a direct challenge to one's conviction or, instead, an independent constitutional claim under 42 U.S.C. § 1983, these ultimate constitutional questions may well be (and, for the reasons recited below, I believe are) directly presented in the case before us.

Under applicable Supreme Court precedent, if the assertion of a post-conviction right of access to evidence for STR DNA testing that is herein made by appellee "necessarily implies" the invalidity of his conviction or sentence, then that right must be adjudicated in habeas corpus; a section 1983 claim does not lie, as a matter of law; and, given that in this case leave was not sought to raise the issue successively, the delicate question of whether such a right exists under the Constitution not only can be, but ought be in the interest of prudence, avoided. On the other hand, if the assertion of this right does not necessarily imply the invalidity of the underlying conviction or sentence, but, rather, is properly understood as independent of any attack on the underlying conviction or sentence, then the instant case directly and unavoidably presents the exceedingly difficult and delicate questions of whether such a constitutional right to access previously-produced forensic evidence post-conviction for purposes of STR DNA testing does exist and, if it does, the circumstances under which it may be asserted. For, in the judgment under review, the distinguished district court judge held not only that there is such a right of access to evidence under the Constitution assertable under section 1983, but that that right would be abridged in this case were the requested access denied.

The majority of our court, in a holding of significance in its own right, reversed the district court's threshold judgment, concluding that the assertion of a post-conviction right to evidence for the purpose of STR DNA testing "necessarily impl[ies] the invalidity of [Harvey's] conviction," *Harvey* v. *Horan*, 278 F.3d 370, 374 (2002) (quoting *Heck* v. *Humphrey*, 512 U.S. 477, 486-87 (1994)). Consequently, it held that appellee did not, and could not, state a claim for relief under

15

section 1983. *Id.* Thereafter, although it need not have done so, the majority proceeded also to hold, on the underlying fundamental constitutional question, that there is no right under the Constitution to access evidence post-conviction for STR DNA testing under any circumstance, for any purpose.

I would prefer not to have to address even the threshold, much less the fundamental constitutional, question in the posture of an opinion respecting a denial of rehearing *en banc*. However, the panel's decision now constituting the law of our Circuit, this is the proper and only context in which to express my views on the important matters decided. This being the case, I believe that the court erred in both of its holdings, and, at least in the first (if not also in the second), fairly clearly so.

I do not believe that the assertion of a constitutional right of access to evidence post-conviction even arguably implies, let alone "necessarily implies," the invalidity of the petitioner's conviction or sentence, as it must in order to be foreclosed under *Heck* v. *Humphrey*. If one concludes, as would I, that the access claim *is* one properly brought under section 1983, then the fundamental question of whether there is a constitutional post-conviction right to evidence for purposes of STR DNA testing must be decided. As to this question, I believe, also contrary to the majority, that there is a residual, core liberty interest protected by the Due Process Clause of the Fourteenth Amendment which, in certain, very limited circumstances, gives rise to a procedural due process right to access previously-produced forensic evidence for purposes of STR DNA testing.

A.

As to the threshold procedural question, I do not believe it even arguable that a post-conviction action merely to permit access to evidence for the purpose of STR DNA testing "necessarily implies" invalidity of the underlying conviction. Indeed, such *necessarily* implies nothing at all about the plaintiff's conviction. It certainly implies nothing more (and arguably it implies a good deal less) than does an assertion of constitutional right to material and exculpatory information producible under *Brady* v. *Maryland*, 373 U.S. 83 (1963), which has never been thought necessarily to imply the invalidity of the

16

underlying conviction. The results of any DNA tests that are eventually performed may be inconclusive, they may be insufficiently exculpatory, or they may even be inculpatory. That these scientific possibilities exist, in and of itself, suffices to establish that the asserted right of mere access is not a direct, or for that matter even an indirect, attack on one's conviction or sentence. But if this were not enough to establish the point, then it should be that, in order to overturn a conviction based on exculpatory evidence that might appear from any DNA testing, the petitioner would have to initiate an entirely separate action at some future date, *in which he would have to argue for his release upon the basis of a separate constitutional violation altogether*.

In sum, on no understanding would a plaintiff's action for mere access to evidence, "even if successful," "demonstrate the invalidity of any outstanding criminal judgment." *Heck*, 512 U.S. at 487. Therefore, on the direct authority of *Heck*, which properly was actually a quite narrow decision, "the action should be allowed to proceed in the absence of some other bar to the suit." *Id*.

Such an assertion of a right only to access is, in principle, wholly unlike the claims asserted in *Heck* for an assertedly illegal investigation and arrest. Those claims, the Supreme Court reasoned, were most analogous to the common-law cause of action for malicious prosecution, *id*. at 484, which required the plaintiff-accused to allege and prove the termination of the prior criminal proceeding in his favor. *Id*. Indeed, the almost polar difference between the claims in *Heck* for "actions whose unlawfulness would render a conviction or sentence invalid," *id*. at 486, and the claim of right merely to access evidence for the purpose of further tests, the results of which may even prove the defendant's *guilt* beyond any question, is virtual confirmation that the latter is not a challenge to one's conviction or sentence, but, rather, an assertion of an independent constitutional right.

The specific examples that the Supreme Court offered to illustrate the line of distinction between a cause of action that necessarily implies the invalidity of a conviction and one that does not, remove any doubt on this score. As an illustration of the former, the Court offered the example of a state defendant who was convicted of resisting a lawful arrest and brings an action under section 1983 for an

17

unreasonable seizure in violation of the Fourth Amendment. *See Heck*, 512 U.S. at 486, n.6. Such an action would be barred, explained the Court, because, "[i]n order to prevail in this § 1983 action, [the state defendant] would have to *negate an element* of the offense of which he has been convicted," *id.* (emphasis added) — that element being that the arrest was lawful.

On the other end of the continuum, as an illustration of a cause of action that would be allowed to proceed under section 1983, the Court offered the example of a plaintiff who brings a section 1983 action for damages for an unlawful search that produced the evidence on the basis of which the plaintiff was convicted. *Id.* at 487 n.7. Because the fruits of that (possibly illegal) search might ultimately be admissible under the independent source or inevitable discovery doctrines, or their admission be deemed harmless error, the Court explained, this plaintiff's section 1983 action, "even if successful, would not *necessarily* imply that the plaintiff's conviction was unlawful." *Id.* (emphasis in original).

That the Court snugly drew the fault line to the *necessity* that the success of the 1983 action depend upon proof that the underlying conviction is invalid if it is to be foreclosed, is evident from its insistence upon negation of an offense element in the first example and its own revealing italicization of the imperative in the latter.

The implications for the present case of so tightly drawing the line are apparent. In the extent to which it implies invalidity of the underlying conviction, a claim of constitutional right of access to evidence for DNA testing does not even approach the claim that was said by the Court in its footnote 7 *not* to necessarily imply the invalidity of the conviction; further still is such a claim from the one that the Court said in its footnote 6 *would* necessarily imply the invalidity of the conviction. The plaintiff who presents a claim of constitutional right of access to evidence does not even have to rely upon an exception in law to avoid what would otherwise be the unavoidable conclusion that the plaintiff's complaint of an unlawful search would necessarily draw into question his underlying conviction; and the plaintiff who merely seeks access to evidence for testing certainly is not required to "negate an element of the offense of which he has been convicted," *Heck*, 512 U.S. at 486 n.6, in order to prevail.

18

The conclusion is inescapable from these examples (even if it were not from the reasoning of the opinion itself) that the claim of a right of access to evidence is not one that in any respect implies the invalidity of the claimant's conviction and sentence.

Not only does such a conclusion seem unassailable under *Heck* v. *Humphrey*, but in a twist to be sure, it is all but, if not fully, established by two (frankly striking) passages from the majority's own opinion. In the first, the majority writes as follows:

> [Section] 1983 exists for the more limited purpose of redressing violations of the Constitution and federal statutes. *Harvey has made no argument that his conviction violates the Constitution or any federal law.* In fact, at oral argument Harvey conceded that he received due process under the law and under the science in existence when he was convicted in 1990. To confer upon Harvey a wide-ranging constitutional right *in the absence of any argument that his underlying conviction violated the Constitution or a federal statute* is simply beyond judicial competence.

*Harvey*, 278 F.3d at 376 (emphasis added). And in the second, combined passage, the majority states, equally tellingly, that,

> Harvey is seeking access to DNA evidence for one reason and one reason only — *as the first step in undermining his conviction.* He believes that the DNA test results will be favorable *and will allow him to bring a subsequent motion to invalidate his conviction.* . . . Harvey is attempting to . . . use his claim for access to evidence *to set the stage for a future attack on his confinement.*

*Id.* at 375, 378 (emphases added). Standing alone, as they do, against what are only conclusory statements by the majority to the contrary, I believe that these passages establish beyond any question that, *even on the majority's own understanding*, appellee's access claim does not "necessarily imply" the invalidity of his conviction, and therefore that he has properly alleged a cause of action under section 1983.

19

I am not entirely clear how the majority comes to the contrary conclusion. It appears, however, that in effect it mistakenly analyzed appellee's claim as if it were one alleging a constitutional right not to be punished upon proof of actual innocence (proof in the form of the STR DNA results appellee hopes will emerge from the tests he wishes to have performed if his asserted right to access is accepted). *This* claim would indeed be foreclosed by *Heck*, because it *would* "necessarily imply" the invalidity of appellee's conviction and sentence. But this is not the claim that appellee makes. His, rather, is an antecedent claim to such a factual innocence claim. For the reasons recited, such a claim in no way implies, much less "necessarily implies," the invalidity of appellee's conviction or sentence.

B.

On the understanding that appellee's claim is, as he contends, properly brought under 42 U.S.C. § 1983, I believe, for the reasons I have identified, that there is an affirmative obligation to decide the fundamental constitutional question presented by this case. That question is not, as the majority characterizes it, whether we are "to declare a *general* constitutional right for *every* inmate to *continually* challenge a valid conviction based on *whatever* technological advances may have occurred since his conviction became final." *Harvey*, 278 F.3d at 375 (emphasis added). Nor is it whether we are to"[e]stablish[] a constitutional due process right under § 1983 to retest evidence with *each* forward step in forensic science." *Id.* at 376 (emphasis added). The beauty of these questions (whether intended or not) is that they carry with them easy answers, answers to which there would likely not even be dissent.

The far narrower question that we are asked to decide, which is considerably more difficult and consequently more difficult to dismiss with the back of the hand, is whether there exists a constitutional right, post-conviction, to access previously-produced forensic evidence for the purpose of DNA retesting in light of the particular, extra-ordinary scientific advance represented by STR and its related techniques, which it is agreed have the potential in certain instances to prove beyond *all* doubt whether the requesting person in fact committed the crime for which he was convicted and sentenced. The asserted right at issue is not one to material, exculpatory evidence

20

necessary to ensure a fair trial. *See Brady* v. *Maryland*, 373 U.S. 83. It is not a right of "factual innocence." *See Herrera* v. *Collins*, 506 U.S. 390 (1993). Nor is it one of right to the preservation of potentially exculpatory evidence. *See Arizona* v. *Youngblood*, 488 U.S. 51 (1988). At least as classically understood, it is not a right of procedural due process. And neither is it a typical substantive due process right. But it is a right that *legitimately* draws upon the principles that underlay all of these — a conceptual and constitutional fact that understandably eluded, at the same time that it confounded, the majority and the concurrence, appellant, and even appellee.

As to this fundamental constitutional question, I understand the majority to *hold* that there exists no such right of access to evidence post-conviction, regardless of the circumstance.[2] But regardless

(Text continued on page 23)

_____

[2] I do not believe that there is any question that the majority's rejection of a right to access evidence for post-conviction DNA testing is a holding, rather than a mere expression of opinion in dicta. And certainly litigants must now proceed on the understanding that this court has rejected such a right. The majority's statements rejecting any such right are many and unequivocal. *See, e.g., Harvey*, 278 F.3d at 372 ("The district court found that Harvey had a due process right of access to the DNA evidence and a right to conduct testing upon the evidence using technology that was unavailable at the time of his trial and at the time his conviction became final. . . . We disagree."); *id.* at 375 n.1 ("In sum, the second section of our concurring brother's opinion [in which, according to the majority, *see Harvey*, 278 F.3d at 380 n.3, the concurrence "addresses and rejects a variety of theories under which a § 1983 action may lie" for the government's refusal to permit Harvey access to evidence for DNA testing] underscores why the broad-ranging right intimated in the first section cannot exist."); *id.* at 375-76 ("Harvey would have this court fashion a substantive right to post-conviction DNA testing out of whole cloth or the vague contours of the Due Process Clause. . . . The possibility of post-conviction developments, whether in law or science, is simply too great to justify judicially sanctioned constitutional attacks upon final criminal judgments."); *id.* at 376 ("Establishing a constitutional due process right under § 1983 to retest evidence with each forward step in forensic science would leave perfectly valid judgments in a perpetually unsettled state. This we cannot do."); *id.* ("While finality is not the sole value in the criminal justice system, neither is it subject to the kind of blunt abrogation that would occur with the recognition of a due process

21

entitlement to post-conviction access to DNA evidence."); *id.* ("To confer upon Harvey a wide-ranging constitutional right in the absence of any argument that his underlying conviction violated the Constitution or a federal statute is simply beyond judicial competence."); *id.* ("In holding that Harvey has failed to state a claim under § 1983, we do not declare that criminal defendants should not be allowed to avail themselves of advances in technology. Rather, our decision reflects the core democratic ideal that *if this entitlement is to be conferred*, it should be accomplished by legislative action *rather than by a federal court as a matter of constitutional right*." (emphases added)); *id.* at 377 ("Harvey urged us to use the balancing test of *Mathews* v. *Eldridge* to fashion a broad constitutional due process right of access to DNA testing. . . . Establishing a federally supervised right of access via *Mathews* [v. *Eldridge*] would cut off th[e] ongoing process [of legislative consideration] and place the federal courts in a distinctly legislative posture." (citations omitted)); *id.* at 380 ("Fashioning a new federal constitutional right that would govern all prisoners in all states is not a permissible way of addressing the question of post-conviction testing."); *id.* at 380 n.3 ("The opinion of our concurring colleague *likewise* underscores the limitations of a § 1983 action by a state prisoner to secure evidence in federal courts." (emphasis added)); *see also id.* at 381 (King, J., concurring in part and concurring in the judgment) (noting his agreement with the majority's conclusions that "the district court erred in concluding that Harvey's denial of post-conviction access to the biological evidence relating to his rape conviction contravened the requirements of *Brady* v. *Maryland*, 373 U.S. 83 (1963), and that Harvey's due process rights were violated by the conduct of the Commonwealth Attorney.").

The majority begins its Part IIA treatment of the merits of appellee's evidentiary access claim as if to follow were merely a discussion of the implications of allowing actions that are actually challenges to one's underlying conviction or sentence to proceed under section 1983. *See Harvey*, 278 F.3d at 375 ("The implications of circumventing *Heck* are no small matter."). However, what follows is not this at all, but, rather, a discussion of the implications of recognizing a post-conviction constitutional right of access to evidence for the purpose of DNA testing, followed in turn by the majority's conclusion that "[t]he possibility of post-conviction developments, whether in law or science, is simply too great to justify judicially sanctioned constitutional attacks upon final criminal judgments." *Id.* at 376. That is, the majority summarizes its discussion

22

whether one understands the majority's conclusion as a holding or as mere dicta,[3] I believe that, in its conclusion that no right of access to evidence post-conviction exists under the Constitution, the court also erred.

1.

I believe, and would hold, that there does exist such a post-conviction right of access to evidence.

Even those in our society who have been lawfully deprived of their freedom retain residual, substantive liberty interests protected by the Fourteenth Amendment. *See, e.g.*, *Youngberg* v. *Romeo*, 457 U.S. 307, 315 (1982) ("The mere fact that [petitioner] has been committed under proper procedures does not deprive him of all substantive liberty interests under the Fourteenth Amendment." (citation omitted)); *id.* at 315-16 (noting that the incarcerated have liberty interest in food, shelter, and clothing, and holding that prisoners also retain liberty interest in personal security (citing *Ingraham* v. *Wright*, 430 U.S. 651, 673 (1977), and *Hutto* v. *Finney*, 437 U.S. 678 (1978))); *Vitek* v.

_____

not with the conclusion that recognizing a cause of action under section 1983 to raise challenges to one's conviction or sentence would be detrimental to finality, but with the significantly different, and significant, conclusion that recognition of the particular right to access evidence post-conviction would come at too great a cost to the finality interest. And for that reason does the majority hold that no such right exists. *Id.* ("In so holding . . . .").

[3] I suppose one could argue, on a theory that a court cannot possibly render a *holding* on a question unless it is absolutely essential to the court's disposition of the case, that the majority's extensive discussions and rejection of such a right can only be *dicta*. However, as a member on a court panel, I would never regard myself as at liberty after today, in the face of the majority's clear, repeated, and unequivocal statements, *see* note 2 *supra*, to hold that there is a constitutional right of access to evidence post-conviction for purposes of DNA testing. I would never consign such statements to *dicta*, where, as here, they are made on an issue of this importance, as to which the members of the court have obviously given the most careful consideration. To do so would, in my view, be to disrespect the precedent established by my colleagues.

23

*Jones*, 445 U.S. 480, 491-94 (1980) (holding that convicted felon retains a liberty interest, not extinguished by his confinement, in not being transferred to a mental institution without due process); *cf. Foucha* v. *Louisiana*, 504 U.S. 71, 78-79 (1992) (insanity acquitee retains residual liberty interest, protected by due process, in not being committed to mental institution after he is no longer mentally ill and no longer poses a danger to himself or others); *Morrissey* v. *Brewer*, 408 U.S. 471, 482 (1972) (holding that parolee has an "indeterminate" liberty interest which "includes many of the core values of unqualified liberty").

And, indeed, the core liberty interest protected by the Fourteenth Amendment — freedom from bodily restraint — itself, residually survives conviction and incarceration. *See, e.g., Foucha*, 504 U.S. at 80 ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action."); *Greenholtz* v. *Nebraska Penal Inmates*, 442 U.S. 1, 18 (1979) (POWELL, J., concurring in part and dissenting in part) (noting that "[l]iberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action"); *see also Youngberg*, 457 U.S. at 316 (quoting *Greenholtz*, 442 U.S. at 18 (POWELL, J., concurring in part and dissenting in part), and noting that "[t]his interest [in freedom from bodily restraint] survives criminal conviction and incarceration").

Were I writing on a clean slate, I would conclude that one retains, even after conviction and sentence, not only a protected liberty interest in his core right to freedom from bodily restraint, but also a protected liberty interest to pursue his freedom from confinement, though obviously after conviction these interests are residual and considerably reduced (to say the least) from those existing pre-conviction. There may even be an interest in freedom from confinement itself, although such a conclusion arguably is foreclosed by precedent. Chief Justice Rehnquist writing in *Ohio Adult Parole Authority* v. *Woodard*, 523 U.S. 272 (1998), in an opinion for four Members of the Court, said that an individual who has been lawfully convicted no longer possesses a cognizable due process interest in his actual release from confinement through clemency, whether he is sentenced to a term of imprisonment or to death. *See id.* at 283 ("There is no substantive

24

expectation of clemency."). An interest in release, by the executive, through parole, pardon or commutation, he explained, "is indistinguishable from the initial resistance to being confined, and that interest has already been extinguished by the conviction and sentence." *Id.* at 280 (internal quotations and citations omitted); *see also id.* at 282 (quoting *Connecticut Bd. of Pardons* v. *Dumschat*, 452 U.S. 458, 465 (1981)).

However, it is not entirely clear that a *majority* of the Court agrees that there is no liberty interest at all in one's freedom from confinement post-conviction. Justice O'Connor, for herself and three different Justices from those who joined the Chief Justice, wrote separately in *Ohio Adult Parole Authority*, concurring in part and concurring in the judgment only. Although disagreeing with the Chief Justice that a prisoner under sentence of death no longer retains a life interest cognizable under the Due Process Clause, *id.*;[4] *see also id.* at 290-95 (opinion of STEVENS, J., concurring in part and dissenting in part) (agreeing that liberty interest in release is "extinguished" upon lawful conviction and sentence and that cognizable life interest continues for one sentenced to death), Justice O'Connor did appear to agree with the Chief Justice that one's liberty interest "in being free from confinement" is "extinguished" once he has been lawfully convicted and sentenced, *see Ohio Adult Parole Authority*, 523 U.S. at 288, 289.

But, while she appeared to agree on this point, she did not distinguish between capital and noncapital prisoners in her ultimate conclusion that "some *minimal* procedural safeguards apply to clemency proceedings." 523 U.S. at 289 (emphasis in original); *see also id.* (observing, again without distinguishing between capital and noncapital prisoners, that judicial intervention might be in order "in the face of a scheme whereby a state official flipped a coin to determine whether to grant clemency, or in a case where the State arbitrarily denied a prisoner any access to its clemency process"). And more

_____

[4] Believing that the life interest of the capital prisoner survives his conviction and sentence, Justice O'Connor would have held that "some *minimal* procedural safeguards apply to clemency proceedings." *Id.* at 289; *see also id.* at 292 (opinion of STEVENS, J., concurring in part and dissenting in part) (agreeing with Justice O'Connor that "only the most basic elements of fair procedures are required" in clemency proceedings).

importantly, as the Chief Justice implicitly recognized through his refusal to draw a distinction between the constitutionally-protected, post-conviction interests of the capital and the noncapital prisoner, the "life interest" of the capital prisoner would seem to continue (or not) to the same extent as does the "liberty interest" of the noncapital prisoner. Just as the capital prisoner continues to possess an interest in his life because he is still alive, so also does the noncapital prisoner continue to have a liberty interest in his freedom, at least for those days that remain to be served on his sentence. (Of course, while the Chief Justice concludes, for his plurality, that *both* the life and the liberty interests are "extinguished," I believe that arguably neither is.) Thus, I am not convinced that, were the issue squarely put before Justice O'Connor, the three Justices who joined her opinion in *Ohio Adult Parole Authority*, and Justice Stevens, these five Justices would conclude that the noncapital prisoner possesses no liberty interest whatsoever in his freedom from confinement, having concluded as they did that the capital prisoner continues to possess a life interest in clemency that is cognizable under the Due Process Clause.

But, even if the noncapital prisoner's liberty interest both in pursuing his freedom and in actually being free from confinement were completely extinguished upon conviction and sentence, I would hold that, clemency constituting the safety net of our criminal justice system for the prevention of miscarriages of justice, *see generally Herrera* v. *Collins*, 506 U.S. 390, 411-15, the noncapital prisoner retains (as does the capital prisoner, I believe), at least a residual, substantive liberty interest in meaningful access to existing executive mechanisms of clemency, which access would enable him to pursue his freedom from confinement from the executive based upon the claim that he is factually innocent of the crime for which he was convicted. *See id.* at 411-12 & n.13 (explaining that clemency is the "historic mechanism" for obtaining relief based upon factual innocence). This interest exists, I believe, even if there is no independent liberty interest in these mechanisms themselves; in the particular processes by which the executive exercises his discretion to grant or deny clemency; or in the freedom that would result from favorable executive action obtained through these mechanisms, such as would entitle one under the Constitution to a clemency procedure, to particular processes within a clemency procedure, or to actual release pursuant to a clemency procedure. *See*, *e.g.*, *Connecticut Bd. of Pardons* v. *Dumschat*,

26

452 U.S. 458 (1981); *Greenholtz* v. *Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1 (1979); *Ohio Adult Parole Authority* v. *Woodard*, 523 U.S. 272 (1998); *Olim* v. *Wakinekona*, 461 U.S. 238 (1983).[5]

I would further hold that, at least in limited circumstances, this substantive liberty interest is protected through a *procedural* due process right to have previously-produced forensic evidence either released to the convicted individual for STR, or related, DNA testing at his or her own expense, or submitted by the government for such testing, with the test results to be provided thereafter to the convicted individual.

A right of access to evidence for tests which, given the particular crime for which the individual was convicted and the evidence that was offered by the government at trial in support of the defendant's guilt, could prove beyond any doubt that the individual in fact did not commit the crime, is constitutionally required, I believe, as a matter of basic fairness. *See Mathews* v. *Eldridge*, 424 U.S. 319 (1976); *id.* at 334 (holding that due process requires "such procedural protections as the particular situation demands"); *Greenholtz* v. *Nebraska Penal Inmates*, 442 U.S. at 13-14 (applying *Mathews* in determining whether procedures surrounding parole decision satisfied due process); *id.* at 12 ("It is axiomatic that due process `is flexible and calls

_____

[5] The Supreme Court has held that the convicted does not have an independent liberty interest in parole itself (that is, apart from one created by state procedure), *see Greenholtz*, 442 U.S. 1; in a commutation itself, *see Connecticut Bd. of Pardons* v. *Dumschat*, 452 U.S. at 464 (holding that "an inmate has `no constitutional or inherent right' to commutation of his sentence"); or in a pardon itself, *see id.* at 465 (holding that a "felon's expectation that a lawfully imposed sentence will be commuted or that he will be pardoned is no more substantial than an inmate's expectation, for example, that he will not be transferred to another prison; it is simply a unilateral hope"). Moreover, the Court has also held that one does not possess a liberty interest in mere process, in the absence of any substantive interest. *See Olim* v. *Wakinekona*, 461 U.S. 238; *see also Ohio Adult Parole Authority* v. *Woodard*, 523 U.S. 272, 279 n.2 (1998) (noting that the assertion of an interest merely in process itself "is not a cognizable claim" (citing *Olim* v. *Wakinekona*, 461 U.S. at 249-50).

for such procedural protections as the particular situation [requires].'"
(quoting *Morrissey* v. *Brewer*, 408 U.S. at 481)).[6]

_____

[6] Largely for the same reasons that I conclude that a claimed constitutional right of access to evidence post-conviction states a cause of action under 42 U.S.C. § 1983, I believe that *Mathews* v. *Eldridge*, rather than *Medina* v. *California*, 505 U.S. 437 (1992), provides the proper analytical framework for determining whether there exists a procedural due process right to such access. The asserted right of access does not entail a challenge to the underlying conviction, and neither (at least comfortably) is the state's denial of access equivalent to a state rule of criminal procedure governing the process by which one is tried and found guilty or innocent of criminal offense.

However, even were the more demanding standard of *Medina* applicable, I would come to the same conclusion that, in the limited circumstances I have described, access to the evidence is constitutionally required as a matter of procedural due process.

In *Medina*, in reviewing a state's allocation of burden on the question of competency to stand trial, the Court inquired whether "fundamental fairness" required a different allocation from the one made by the state. In the course of this inquiry, the Court examined whether the state's burden allocation "offend[ed] . . . principle[s] of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* at 445 (internal quotations and citations omitted). There may be a sufficient history and tradition, defined at the appropriate level of generality, to support the existence of a procedural due process right under *Medina* like that that I would hold exists under *Mathews*, were the presence *vel non* of that tradition dispositive. We have already required production of exculpatory evidence to the defendant (per *Brady*) for a longer period of time than such had been required at the time *Brady* was decided, *see* note 7 *infra* — a fact that confirms either that the Court will require scant history to support a right of access to evidence, or (more likely) that the due process right recognized in *Brady* was understood to be at a level more general than that of mere pre-trial discovery.

But regardless, under *Medina*, in determining whether fundamental fairness required a federally-defined burden allocation, the Court considered factors in addition to whether there was a tradition of allocating the burden to either the state or the defendant. *See* 505 U.S. at 447-54; *id.* at 448 ("Discerning no historical basis for concluding that the allocation of the burden of proving incompetence to the defendant violates due process, we turn to consider whether the rule transgresses any recognized principle of `fundamental fairness' in operation." (citation omitted)); *id.*

28

For the better part of a half-century, if not longer, the government has been required, as a matter of procedural due process, or basic fairness, *see Albright* v. *Oliver*, 510 U.S. 266, 273 & n.6 (1994), to produce to the defendant all potentially exculpatory evidence in order to ensure that the defendant's trial is fair, *see Brady* v. *Maryland*, 373 U.S. 83; *cf. Mooney* v. *Holohan*, 294 U.S. 103 (1935), a requirement that emerged out of recognition that the interest of our criminal justice system is not only in convicting the guilty but also in ensuring that the innocent are not wrongfully convicted. *See Brady*, 373 U.S. at 87 (quoting, as illustrative of fundamental principle requiring disclosure, inscription on Department of Justice that "[t]he United States wins its point whenever justice is done its citizens in the courts"); *id.* at n.2 (also quoting, as reflective of controlling principle, Solicitor General Soboleff's remark that the government's "chief business is not to achieve victory but to establish justice"); *see also United States* v. *Agurs*, 427 U.S. 97, 110-11 (1976) (explaining that the government's "overriding interest [is] that `justice shall be done'[ ] [and that the prosecutor] is the `servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer" (quoting *Berger* v. *United States*, 295 U.S. 78, 88 (1935))); *California* v. *Trombetta*, 467 U.S. 479, 485 (1984) (noting the Court's development of "what might

_____

at 447 (analyzing contemporary practice); *id.* at 449 (considering strength of nongovernmental interest implicated). *See also id.* at 454 (O'CONNOR, J., joined by SOUTER, J., concurring in the judgment) ("Against the historical status quo, I read the Court's opinion to allow some weight to be given countervailing considerations of fairness in operation, considerations much like those we evaluated in *Mathews*. Any less charitable reading of the Court's opinion would put it at odds with many of our criminal due process cases, in which we have required states to institute procedures that were neither required at common law nor explicitly commanded by the text of the Constitution." (citations omitted)); *cf. County of Sacramento* v. *Lewis*, 523 U.S. 833, 857 (1998) (KENNEDY, J., joined by O'CONNOR, J., concurring) ("That said, it must be added that history and tradition are the starting point, but not in all cases the ending point of the substantive due process inquiry."). Based upon the balancing of all of these factors relied upon by the Court in *Medina*, I would conclude that the right of access is required under the standard of that precedent as well, likewise in the name of fundamental fairness.

loosely be called the area of constitutionally guaranteed access to evidence" and explaining that these privileges "deliver[] exculpatory evidence into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system" (citation omitted)).

Given that the convicted has been found guilty by a jury, deprived of his liberty by due process of law, and thus no longer enjoys the presumption of innocence, no one would contend that fairness, in the constitutional sense, requires a post-conviction right of access or a right to disclosure anything approaching in scope that which is required pre-trial. For instance, it could never be maintained that fairness requires that the convicted be provided with any and all material, potentially exculpatory information that comes forth post-trial, as is required pre-trial. But, at least where the government holds previously-produced forensic evidence, the testing of which concededly could prove beyond any doubt that the defendant did not commit the crime for which he was convicted, the very same principle of elemental fairness that dictates pre-trial production of all potentially exculpatory evidence dictates post-trial production of this infinitely narrower category of evidence. And it does so out of recognition of the same systemic interests in fairness and ultimate truth.

There was a time when concealment and gamesmanship were accepted as part and parcel of the adversarial process of the criminal justice system. As Professor Wigmore colorfully wrote, in discussion of both civil and criminal discovery at common law:

> To require the disclosure to an adversary of the evidence that is to be produced, would be repugnant to all sportsmanlike instincts. Thus the common law permitted a litigant to reserve his evidential resources (tactics, documents, witnesses) until the final moment, marshaling them at the trial before his surprised and dismayed antagonist. Such was the spirit of the common law; and such in part it still is. It did not defend or condone trickery and deception; but it did regard the concealment of one's evidential resources and the preservation of the opponent's defenseless ignorance as a fair and irreproachable accompaniment of the game of litigation.

30

*See* 6 Wigmore, Discovery § 1845 at 490 (3d ed. 1940).[7] But, in the

_____

[7] ***See also Rex*** v. *Holland*, 4 Durn. & E. 691, 693, 100 Eng. Rep. 1248 (K.B. 1792) (rejecting a request for discovery in a criminal prosecution and observing that there is "no principle or precedent to warrant" granting such a request and "if we were to grant it, it would subvert the whole system of criminal law") (Lord Kenyon, C.J.); *id.* at 694 ("The practice on common law indictments, and on information on particular statutes, shews it to be clear that this defendant is not entitled to inspect the evidence, on which the prosecution is founded, till the hour of trial.") (Buller, J.); *id.* ("It is clear that neither at common law, or under any of the statutes, is the defendant entitled as a matter of right, to have his application granted. And if we were to assume a discretionary power of granting this request, it would be dangerous in the extreme, and totally unfounded on precedent.") (Grose, J.); *State* v. *Hall*, 325 Mo. 102, 105 (1930) (denying a request for pre-trial discovery, noting that such disposition is consistent with decisions of other jurisdictions, and observing that if it were to grant access to evidence, the defendant could "for like reason, and upon the same principle, have asked the court to require the state to produce its witnesses before his counsel, for their examination in regard to their knowledge of the case, that he might thereby be better prepared to make his defense; something for which no lawyer would contend") (citations omitted); *State ex. rel. Robertson* v. *Steele*, 117 Minn. 384, 385 (1912) ("Shall a county attorney, prior to trial, be compelled to disclose the evidence he has against an indicted person? It must be admitted that under the common law it could not be done."); *Wendling* v. *Commonwealth*, 143 Ky. 587 (1911) ("We know of no practice that makes it incumbent upon the commonwealth to submit before the trial for the inspection and examination of the accused or his counsel articles in the possession of the commonwealth that it proposes to and will introduce as incriminating evidence against him, but both the accused and his counsel should have full and free opportunity to examine them when offered as evidence."); *State* v. *Howard*, 191 Iowa 728 (1921) (accused is not entitled to inspect exhibits, such as a murder weapon, used by the grand jury); *Commonwealth* v. *Jordan*, 207 Mass. 259 (1911) (denying a request in a homicide case for a pre-trial inspection of an autopsy report); *Santry* v. *State*, 67 Wis. 65 (1886) (denying a request for a pre-trial inspection of a copy of a convicted co-defendant's confession); *cf. People ex. rel. Lemon* v. *Supreme Court*, 245 N.Y. 24, 32 (1927) (Cardozo, J.) (noting the "beginnings or at least glimmerings" of a "power in courts of criminal jurisdiction [other than in New York] to compel the discovery of documents in the furtherance of justice," but denying the motion for discovery of documents that would not be admissible at trial).

interests of both elemental fairness and truth, we decidedly rejected this system long ago, in favor of one that insists instead upon full disclosure of all evidence that might prove innocence. *See, e.g., Brady* v. *Maryland; United States* v. *Agurs*, 427 U.S. at 108 (noting that the Court had in *Brady* "expressly rejected" the "`sporting theory of justice'"). Under this very different system of full disclosure, it would simply be "constitutionally intolerable," *Herrera* v. *Collins*, 506 U.S. at 419 (concurring opinion of O'CONNOR, J., joined by KENNEDY, J.), for the government to withhold from the convicted, *for no reason at all*, the very evidence that it used to deprive him of his liberty, where he persists in his absolute innocence and further tests of the evidence could, given the circumstances of the crime and the evidence marshaled against the defendant at trial, establish to a certainty whether he actually is factually innocent of the crime for which he was convicted. The denial of access in this circumstance would not be, do I contend, the strict equivalent of bad-faith destruction of potentially exculpatory evidence. *See Arizona* v. *Youngblood*, 488 U.S. 51. But in a system that prizes fairness and truth above all else, it comes so perilously close to such as not to be permitted. *See id.* at 337 (holding that due process requires the preservation of evidence where "the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant").

2.

As I suggest above, the claimed right of access to evidence partakes of both procedural and substantive due process. And with a claim such as this, the line of demarcation is faint. However, were there not the procedural due process right to access evidence for STR and related DNA testing that I believe exists, *see Graham* v. *Connor*, 490 U.S. 386 (1989), then I believe that under established Supreme Court precedent there might well be a straightforward *substantive* due process right to such access. *See generally Daniels* v. *Williams*, 474 U.S. 327, 331 (1986) (holding that the Due Process Clause "bar[s] certain government actions regardless of the fairness of the procedures used to implement them"); *County of Sacramento* v. *Lewis*, 523 U.S. 833, 856-57 (1998) (KENNEDY, J., joined by O'CONNOR, J., concurring) (noting that "[i]t can no longer be controverted that due process has a substantive component"); *cf. Brady* v. *Maryland*, 373 U.S. at 87-88; *Herrera* v. *Collins*, 506 U.S. at 417 (assuming

32

arguendo that there exists a constitutional right not to be executed upon proof of actual innocence); *id.* at 419 (O'CONNOR, J., joined by KENNEDY, J., concurring; citations omitted) (noting agreement "with the fundamental legal principle that executing the innocent is inconsistent with the Constitution" and observing that "[r]egardless of the verbal formula employed . . . the execution of a legally and factually innocent person would be a constitutionally intolerable event").

The Court itself has yet to come to rest on the precise scope of the substantive protections of the Due Process Clause, having rendered at times, as is relevant to this case, seemingly conflicting opinions on whether these protections extend beyond those matters that enjoy respect in our Nation's history and traditions, also to the forbiddance of arbitrary government conduct. And even as to each of these strands of substantive due process, the Court is engaged in ongoing debates over the kind and quality of history and tradition that will suffice to establish a right and the range of arbitrary governmental action against which the Due Process Clause protects. I would never attempt to reconcile (or, for that matter, even to understand) all of the Supreme Court's own precedents in this most sensitive area of its jurisprudence. But, arguably, under those precedents the right of access to evidence is sufficiently supported by the history and traditions that our criminal justice system be fair and that the innocent not be wrongfully deprived of their liberty, and by our now-settled practice, adopted in pursuit of the same interests, that all potentially exculpatory evidence be provided to the accused in advance of trial (and even to the convicted post-trial, if previously known to the government). *See* note 6 *supra*; *see generally Washington* v. *Glucksberg*, 521 U.S. 702, 720-22 (1997) (holding that "[o]ur Nation's history, legal traditions, and practices provide the crucial `guideposts for responsible decisionmaking' that direct and restrain our exposition of the Due Process Clause" (citation omitted)).

But if not satisfactorily supported by these longstanding legal traditions and established practices, then the right of access might very well be grounded in the patent arbitrariness of denying access to such evidence in the absence of any governmental interest whatsoever in the withholding of such. *See generally Daniels* v. *Williams*, 474 U.S. at 331 ("[T]he Due Process Clause . . . was `intended to secure the individual from the arbitrary exercise of the powers of govern-

ment[,]'" (quoting *Hurtado* v. *California*, 110 U.S. 516, 527 (1884); citations omitted)); *County of Sacramento* v. *Lewis*, 523 U.S. 833, 846 (citing *Daniels*, describing arbitrary governmental action as including "the exercise of power without any reasonable justification in the service of a legitimate governmental objective," and holding that the "cognizable level of executive abuse of power" necessary for substantive due process claim is "that which shocks the conscience"); *County of Sacramento* v. *Lewis*, 523 U.S. at 856-57 (KENNEDY, J., joined by O'CONNOR, J., concurring) (observing that "history and tradition are the starting point, but not in all cases the ending point of the substantive due process inquiry"). I am reluctant to predict the Court in this highly subjective area of the law. However, I believe that, excepting those Justices peculiarly inured in what can be the ways of bureaucracy, that it could indeed be thought shockingly arbitrary that the government would literally dispose of the evidence used to deny one of his liberty (if not his right to life) before it would turn that evidence over to the individual, when he steadfastly maintains his factual innocence and asks only that he be allowed to subject that evidence to tests which, it is conceded, given the evidence introduced at trial in support of conviction, could prove him absolutely innocent of the crime.

3.

The limited right of access to evidence post-conviction (whether procedural or substantive) that I conclude is protected by the Constitution, exists, I believe, irrespective of whether the results of any tests performed could constitute a basis for issuance of a writ of habeas corpus or even be admissible before a judicial tribunal in the course of a proceeding to obtain a writ of habeas corpus. But, if further access to the judicial process is unavailable — either because of procedural bar or the ultimate rejection of a freestanding constitutional right not to be punished if actually innocent — then the case for recognition of this right of access to evidence is all the stronger, if, indeed, it is not then compelling.

4.

That the Constitution would recognize a limited right of access to previously-produced forensic evidence should be unsurprising. Even

34

though the incarcerated individual has been deprived of his liberty through due process of law, he obviously still has a continuing interest in the pursuit of his freedom from the executive through mechanisms of pardon, commutation, and parole that have been established by the executive (if not also from the judiciary through its processes). At least in the circumstances where STR or related DNA testing of previously-provided forensic evidence could prove the individual's innocence beyond all doubt, this interest is sufficient to outweigh the government's comparatively insubstantial interest in the withholding of access to the evidence in question — an interest which I submit is non-existent where further resort to the judicial process is, under law, no longer available. Were mere access to such evidence denied in circumstances where it is possible to prove the individual's innocence beyond all doubt, the incarcerated would be effectively foreclosed from recourse to the very executive processes that the Supreme Court has instructed are, collectively and appropriately, the safety net of our criminal justice system — and in precisely the circumstances in which the Court itself has repeatedly said that such recourse should lie, namely, where the system has failed by convicting the truly innocent. *See Herrera* v. *Collins*, 506 U.S. at 411-12 (observing that "[c]lemency is deeply rooted in our Anglo-American tradition of law, and is the historic remedy for preventing miscarriages of justice where judicial process has been exhausted" (footnotes omitted)); *id.* at 412 n.13 (noting that "clemency has provided the historic mechanism for obtaining relief" on claims of actual innocence made after conclusion of judicial proceedings); *id.* at 415 ("Executive clemency has provided the `fail safe' in our criminal justice system.").

It is one thing to say that further access to the apparatus of the criminal justice system must at some point be curtailed in the indisputable interest of finality. It is another altogether to say that, having curtailed that access to the courts, one will even be denied access to evidence in the government's hands that he could present to the executive in an effort to prevent a miscarriage of justice, after he has been told that it is the role of the executive, not the courts, to prevent miscarriages of justice which, because of finality, are no longer remediable through the judicial process. Not only would such be fundamentally unfair; it would constitute, by definition, wholly arbitrary governmental conduct.

35

## C.

I need not here, given the court's disposition to deny *en banc* reconsideration, define with precision the contours of the right of access to evidence that I believe exists under the Constitution. It is enough to say, however, that, even as a definitional matter, I would very narrowly confine the right. Moreover, in addition to cabining the right through definition at the outset, I would contemplate that the standards governing when this right may be asserted would be correspondingly strict and limiting. And, of course, this is to say nothing at all about the issue not before us today, of the circumstances, if any, under which an individual whose STR DNA test results prove that he is actually innocent of the crime for which he is incarcerated would be able to avail himself of the writ of habeas corpus in order to secure his release.

As with the recognition of any constitutional right, these parameters and standards must be fleshed out with care. It would ordinarily be incumbent upon one who identifies the right at least to begin these tasks of definition and specification. But, given the posture in which I write, it would be imprudent for me to undertake these formidable tasks herein.

I would observe this, however. In light of the inevitable substantive and procedural limitations that would have to be imposed on the post-conviction right of access to evidence, I do not believe that there would be the dire consequences for finality that the majority believes would necessarily attend recognition of such a right, and on the basis of which the majority rejects the right. I believe that the majority's fears in this regard are the result of its failure, as I detail more fully below, to understand the critical distinction between the question of whether there is a right under the Constitution to access evidence post-conviction for purposes of STR DNA testing and the very different set of questions relating first, to the procedures required to protect that right and, second, to the conditions under which the right will be noticed (if at all) on a writ of habeas corpus.

36

D.

Upon a careful examination of the majority's opinion, it appears that it rests its contrary holding, that the Constitution does not provide a right of access to evidence post-conviction for STR DNA testing, largely on the perceived adverse effects that recognition of such a right would have upon the finality of criminal judgments.[8]

The lion's share of the majority's discussion of the substantive

_____

[8] The majority rejects that such a right of access exists on at least two other grounds, as well. In the latter portion of its Part IIA discussion of the merits of appellee's claim, the court canvasses the various state and federal legislation that has been introduced to provide for post-conviction DNA testing, and concludes that a holding that the Constitution provides a right of access to evidence post-conviction "would judicially preempt legislative initiatives in this area." *Harvey*, 278 F.3d at 377. *See also id.* ("Establishing a federally supervised right of access via *Mathews* [v. *Eldridge*, 424 U.S. 319 (1976),] would cut off this on-going process and place the federal courts in a distinctly legislative posture.").

With respect, while these observations are important ones, perhaps even suggesting the wisdom of refraining from decision of the important issue of constitutional right if possible, they are unpersuasive as reason for rejecting the existence of the right that appellee asserts. If conventional constitutional analysis yields the conclusion that there is a right under the Constitution to access evidence post-conviction for the purpose of DNA testing, then the fact that there are pending legislative proposals that would secure the same right is simply irrelevant, except perhaps, as I note, to the entirely separate question of prudential forbearance. *See Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137 (1803).

In Part IIB of the majority's opinion, the court rejects appellee's argument that *Brady* v. *Maryland* establishes the right of access for which appellee argues:

> Harvey does not state a valid *Brady* [v. *Maryland*] claim because he is not challenging a prosecutor's failure to turn over material, exculpatory evidence that, if suppressed, would deprive the defendant of a fair trial. Harvey received a fair trial and was given the opportunity to test the DNA evidence during his trial using the best technology available at the time.

*Harvey*, 278 F.3d at 378-79 (citations omitted).

37

merits of appellee's claim appears in Part IIA of the court's opinion. There, having concluded finally that appellee's action necessarily implies the invalidity of his conviction and "[a]s such, [that] an action under 42 U.S.C. § 1983 cannot lie," *Harvey*, 278 F.3d at 375, the court turns to the fundamental question of whether there exists a constitutional right to access evidence post-conviction, *see id.* ("Harvey would have this court fashion a substantive right to post-conviction DNA testing out of whole cloth or the vague contours of the Due Process Clause."). In the following two pages, the majority's discussion focuses exclusively on the consequences of recognition of such a right for society's interest in the finality of criminal judgments. *See id.* at 375-76. And consistent with this focus, in the only sentences of explanation for the court's rejection of appellee's claim on the merits, the sole rationale offered is the adverse effects on the finality interest that would be felt if such a constitutional right were recognized. *See id.* at 376 ("The possibility of post-conviction developments, whether in law or science, is simply too great to justify judicially sanctioned constitutional attacks upon final criminal judgments. In so holding . . . ."); *id.* ("While finality is not the sole value in the criminal justice system, neither is it subject to the kind of blunt abrogation that would occur with the recognition of a due process entitlement to post-conviction access to DNA evidence.").

While I hesitate even to make the suggestion, it is almost impossible to avoid the conclusion from this discussion that, in rejecting appellee's asserted constitutional right, the majority fundamentally confused section 1983 and section 2254, or at least the interplay of these two causes of action post-*Heck*. That is, it appears that the majority conflated the underlying section 1983 inquiry (not the *Heck* inquiry) of whether a constitutional right of access to evidence post-conviction exists, with the altogether different section 2254 inquiry of whether a claim is cognizable on habeas corpus.[9] Indeed, the evidence that the court did just that is all but compelling.

_____

[9] In fact, at times, the majority even seems to conflate the question (under *Heck*) of whether a particular right may be asserted under section 1983 and the question of whether such a right exists under the Constitution at all. There seems to course through the majority's analysis an unexamined assumption that if a plaintiff's section 1983 action necessarily implies the invalidity of the underlying conviction, and thus fails to

38

First, this appears to be the case from the court's rejection of the constitutional right on the basis of the adverse effect that recognition of such a right would have on the finality of criminal convictions. *See Harvey*, 278 F.3d at 375-76; *see also id.* at 375 (framing the issue presented as whether there is a constitutional right for every inmate "to continually challenge a valid conviction based on whatever technological advances may have occurred since his conviction became final"). If the court had properly understood the distinction between section 1983 and section 2254, it would have resolved the question of whether there exists a constitutional right exclusively through conventional constitutional analysis, rather than by exclusive resort to prudential considerations such as finality, which often do influence questions of cognizance on habeas corpus.

In response to what *is* the conventional legal analysis of appellee's claim by the concurrence, the majority adds a footnote in which it lists the various constitutional bases for the existence of a constitutional right to DNA evidence that were considered and rejected by the concurrence. *See Harvey*, 278 F.3d at 380 n.3. However, even there, the majority does not embrace either the concurrence's analysis or its conclusions; in an opaque statement, it says only that the concurrence "likewise underscores the limitations of a § 1983 action by a state prisoner to secure evidence in federal courts." *Id.*

Relatedly, of course, if the majority had understood the interplay between these two causes of action post-*Heck*, then it would not even

_____

state a claim *cognizable* under section 1983 per *Heck*, then the constitutional right asserted *does not exist at all*. *See, e.g., Harvey*, 278 F.3d at 376 ("In holding that Harvey has failed to state a claim under § 1983, we do not declare that criminal defendants should not be allowed to avail themselves of advances in technology. Rather, our decision reflects the core democratic ideal that if this entitlement is to be conferred, it should be accomplished by legislative action rather than by a federal court as a matter of constitutional right."). In other words, the majority almost appears to believe that to resolve the issue under *Heck* is to resolve the ultimate question of whether there is or is not a right under the Constitution to access evidence post-conviction for purposes of DNA testing. Of course, such would be to mistake *Heck*'s holding with respect to cognizance as, instead, a holding with respect to ultimate constitutional right.

have addressed the merits of appellee's claim. For, if it is concluded, as it was by the majority, that the section 1983 action necessarily implies the invalidity of the underlying conviction, then under *Heck* it follows (but follows only, *see* note 9 *supra*) that there is no *cognizable* section 1983 action. And no further inquiry into whether there is, substantively, such a right is either necessary or warranted.

Second, the confusion that appears logically from the foregoing, actually appears explicitly in the court's opinion. In a critical paragraph, which I fear reveals the extent of both the majority's misunderstanding of the scope of section 1983 and its confusion over the difference between that cause of action and habeas corpus (perhaps generally, but at least post-*Heck*), the court writes as follows:

> Heck teaches that § 1983 does not exist to provide an openended assault on the finality of criminal judgments. Instead, § 1983 exists for the more limited purpose of redressing violations of the Constitution and federal statutes. *Harvey has made no argument that his conviction violates the Constitution or any federal law.* In fact, at oral argument Harvey conceded that he received due process under the law and under the science in existence when he was convicted in 1990. To confer upon Harvey a wide-ranging constitutional right *in the absence of any argument that his underlying conviction violated the Constitution or a federal statute* is simply beyond judicial competence.

*Harvey*, 278 F.3d at 376 (emphasis added). Suffice it to say, if Harvey is making no argument that his underlying conviction is unconstitutional, then it follows not, as the majority concludes, that he has *not* asserted a cause of action under section 1983, but, rather, that he *has* asserted such a cause of action (as opposed to one cognizable only on habeas). It is habeas corpus that exists to relieve one of unconstitutional convictions and sentences, not section 1983; it is for this very reason that a habeas petitioner must, in order to obtain relief, show that his conviction resulted from a violation of the Constitution. There is no requirement under section 1983 that such a showing be made. This is precisely the reason for the Supreme Court's holding in *Heck* that a cause of action under section 1983 fails to state a claim for which relief may be granted if it is necessarily an attack on conviction or

40

sentence; otherwise, section 1983 could indeed be invoked to circumvent the requirements and limitations of section 2254.

Finally, in my view removing any remaining question over the majority's confusion between section 1983 and section 2254 post-*Heck*, after concluding in Part II*A* of its opinion that appellee failed to state a claim under section 1983 because his cause of action necessarily implies the invalidity of his conviction, the court nonetheless proceeds in Part II*B* to undertake the identical analysis (to the one that it undertook in Part IIA) in order to determine the identical question that it had just answered in Part IIA. It is almost as if the majority had written Part IIB of its opinion unaware of *Heck*, and then added Part IIA subsequently. Thus, after expressly reaffirming in the first sentence of Part IIB that it had held in Part IIA that "Harvey fails to state a claim under § 1983," *Harvey*, 278 F.3d at 377, the majority undertakes to determine whether Harvey's "claim falls within the federal habeas corpus statute," because, it says, " *[i]f it does*, the claim cannot proceed under § 1983." *Id.* at 378 (emphasis added).

This, of course, *is* the *Heck* inquiry, which the majority had just undertaken and completed in Part IIA. The purpose of the *Heck* inquiry into whether a plaintiff's section 1983 claim "necessarily implies" the invalidity of the underlying conviction is to determine whether that claim is in effect one challenging the fact or duration of confinement, and thus may only be brought under section 2254. It is unsurprising, therefore, that the majority's reasoning and conclusion on this question repeats almost *in haec verba* the reasoning and conclusion from its discussion of the identical question in Part IIA:

> Like the prisoner in *Hamlin* [v. *Warren*, 664 F.2d 29 (4th Cir. 1981)], Harvey is challenging the validity of his conviction even though he is not seeking immediate release. Harvey seeks access to DNA evidence to attempt to prove that he is innocent. He is trying to use a § 1983 action as a discovery device to overturn his state conviction. The Supreme Court has made clear that habeas corpus relief is available "to attack future confinement and obtain future releases." *Preiser*, 411 U.S. at 487. This is precisely what Harvey is attempting to do — use his claim for access to evidence to set the stage for a future attack on his confinement. There-

41

fore, his claim is effectively a petition for a writ of habeas corpus.

*Harvey*, 278 F.3d at 378.[10]

Accordingly, even if the majority were correct that there is no constitutional right post-conviction to access evidence for the purpose of DNA testing, it cannot possibly be for the reasons that it articulates. Neither the reasons, nor the analysis that is built upon them, can withstand critical scrutiny.

### III.

In summary, I believe that, were it not for the state court's intervening order following release of our panel's opinion, this case would have been an appropriate one for the full court to consider first, whether a claimed right of post-conviction access to previously-produced forensic evidence for the purpose of performing STR DNA testing is properly brought under 42 U.S.C. § 1983, and second, if it is properly brought under this provision, whether there is such a right under the Constitution of the United States. As explained above, I

_____

[10] In Part IIA, in rejecting appellee's argument that he could proceed under section 1983, the court reasoned thus:

> [W]e see no reason why [the] rationale [of *Heck*] would not apply in a situation where a criminal defendant seeks injunctive relief that necessarily implies the invalidity of his conviction. Harvey's § 1983 claim does just that. He seeks access to biological evidence to challenge the fact or duration of his confinement. Harvey claims that he is innocent and that further DNA testing will lead to his exoneration. Because he seeks to use § 1983 to invalidate a final state conviction whose lawfulness has in no way been impugned, his suit fails under *Heck*. . . .
>
> . . . Harvey is seeking access to DNA evidence for one reason and one reason only — as the first step in undermining his conviction. He believes that the DNA test results will be favorable and will allow him to bring a subsequent motion to invalidate his conviction. As such, an action under 42 U.S.C. § 1983 cannot lie.

*Harvey*, 278 F.3d at 375 (citation omitted).

42

believe that the court majority incorrectly concluded that such an assertion of right fails to state a claim under section 1983 and that the unanimous panel incorrectly held that the Constitution does not provide a post-conviction right, under any circumstance or for any purpose (judicial or executive), to access previously-produced forensic evidence for the purpose of conducting STR DNA testing.

I believe that appellee's claim is one that properly may be pursued under section 1983. I also believe that, in limited circumstances, there is a right under the Constitution to access previously-produced forensic evidence for the narrow purpose of STR DNA testing, the results of which could be presented for consideration to appropriate executive branch officials — whether or not the claimant would be entitled to present such results before a court in a petition for writ of habeas corpus.

Therefore, had the entire court undertaken reconsideration of the panel's decision, I would have held that appellee properly asserted a cause of action under 42 U.S.C. § 1983 and that there is a limited, constitutional post-conviction right of access to previously-produced forensic evidence for the purpose of STR and related DNA testing. Having so held, I would have proceeded to identify the precise circumstances and standards under which this right may be asserted[11] and, thereafter, to determine whether appellee has been denied his right under the Constitution.[12]

_____

[11] *Compare*, *e.g.*, *United States* v. *Augurs*, 427 U.S. at 111 & n.19 (noting that to obtain a new trial based on newly discovered evidence, the defendant has "to satisfy the severe burden of demonstrating that [such] evidence probably would have resulted in acquittal"); *Immigration and Naturalization Service* v. *Abudu*, 485 U.S. 94, 107 n.12 (1988) (same), *with Herrera* v. *Collins*, 506 U.S. at 417 (stating that the "threshold showing for [a claim of actual innocence] would necessarily be extraordinarily high"); *id.* at 429 (WHITE, J., concurring in judgment) ("To be entitled to relief, however, [one claiming actual innocence] would at the very least be required to show that based on proffered newly discovered evidence and the entire record before the jury that convicted him, `no rational trier of fact could [find] proof of guilt beyond a reasonable doubt.'") (quoting *Jackson* v. *Virginia*, 443 U.S. 307, 324 (1979)).

[12] I cannot imagine any circumstance under which appellee would have been entitled to damages from appellant in this case, even were it ulti-

43

Accordingly, although I concur in today's decision by my colleagues not to bring this case before the full court, I do so only because of the state court's intervening order that the withheld evidence be provided for STR DNA testing. Though I am satisfied, because of this order of production, that a denial of rehearing *en banc* is now the proper disposition of this particular case, I hope that our panel's conclusions will not evade further review in the future — if not by our court sitting *en banc*, then otherwise.

_____

mately to have been decided that there had been a violation of appellee's constitutional right of access to evidence post-conviction and that the evidence must be provided to appellee. Given the legal landscape against which it would be held that such a right is protected by the Constitution, it would be impossible to conclude that appellant violated clearly established law in denying appellee the access he seeks. In fact, under existing law, the Commonwealth's Attorney acted entirely reasonably. It follows, therefore, that he would have been entitled to qualified immunity regardless of any holding by this court.